Douglas S. RICHARDS, Jr., et al.,
Appellants,

v.

The STATE of Texas, Appellee.

No. 7488.

Court of Civil Appeals of Texas,
Beaumont.

July 2, 1973.

Rehearing Denied July 26, 1973.

Goodwin & Matheny, Beaumont, for appellants.

Dexter Patterson, Asst. Dist. Atty., Beaumont, for appellee.

KEITH, Justice.

Defendants below appeal from a final judgment permanently enjoining them from the exhibition and distribution of obscene motion pictures. The suit below was brought by the District Attorney of Jefferson County under the authority of § 13, Art. 527, Vernon's Ann.Penal Code (1972 Supp.), hereinafter referred to as the "Act".[1] Trial was to a jury and, in answer to several special issues, the jury found that nine specific films were obscene and that the several defendants knowingly

1. § 13 of the Act has been declared constitutional. State v. Scott, 460 S.W.2d 103, 109 (Tex.1970); Newman v. Conover, 313 F.Supp. 623, 631 (N.D.Tex.1970, three-judge court); Moore v. State, 470 S.W.2d 391, 394 (Tex.Civ.App., San Antonio, 1971, error ref. n. r. e.).

permitted the distribution of one or more of such films.

This cause was submitted on oral argument on June 20, 1973, one day before an important series of decisions on the subject were handed down by the Supreme Court.[2] Although we have not had the benefit of argument by counsel upon this important development, our path through the judicial thicket of pornographic litigation has been aided greatly by this fortuitous event.

For the first time in many years, we have a rather clear-cut definition of obscenity which commands a majority of the United States Supreme Court; and in our discussion of this case we will rely heavily upon the opinions of Chief Justice Burger, the organ of the Court in each instance, and will leave to other scholars the fine nuances to be drawn from the elaborate dissents filed by the minority.

At the outset of our discussion, it is appropriate to note that the State did not contend, by either pleadings or evidence, that the defendants either sold or exhibited the material to minors.[3]

## I. The Decree

The trial court entered judgment permanently enjoining the defendants from: (a) the exhibition or distribution of the specific films mentioned in the several special issues; (b) the exhibition and distribution, "as those terms are defined in Article 527 of the Texas Penal Code," of any other obscene material in violation of the Act; and (c) "exhibiting or selling any other films which show actual acts of fellatio (female's oral stimulation of the male's penis), cunnilingus (male's oral stimulation of female's vulva or clitoris), actual oral genital contact between two or more males

or females, any sexual intercourse between any human and any animal or any scenes depicting actual sexual intercourse between human males and females."

## II. Scope of Review

The defendants attack the judgment with many points raising some of the substantial questions of law which have plagued the courts in recent years in this fertile field of litigation. Other points raise the usual questions of the sufficiency of the evidence to support the specific jury findings, i. e., "no evidence" and "great weight and preponderance of the evidence" points.

■ Although we find no authority specifically in point, we are of the opinion that the points challenging the sufficiency of the evidence should be considered under the usual rules governing appeals in the ordinary civil case. The leading authorities governing this type of review are cited in Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.1965), and will be followed as to such points.

■ However, when we come to consider the question of whether or not the particular motion pictures are obscene, we are required to follow the rulings of the Supreme Court of the United States and to make an independent examination of the whole record. This latter type of judicial review in the First Amendment area was first articulated by the late Justice Harlan, concurring in Roth v. United States, 354 U.S. 476, 497–498, 77 S.Ct. 1304, 1315–1316, 1 L.Ed.2d 1498, 1514 (1957):

"The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and in the nature of things every such suppres-

2. This series of cases, not yet officially reported, included: Miller v. California, —— U.S. ——, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (hereinafter "Miller"); Paris Adult Theatre I v. Slaton, —— U.S. ——, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) hereinafter "Slaton"); United States v. Orito, —— U.S. ——, 93 S.Ct. 2674, 37 L.

Ed.2d 513 (1973) (hereinafter "Orito"); and United States v. 12 200–Ft. Reels of Super 8mm. Films, —— U.S. ——, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973) (hereinafter "12 200–Ft. Reels").

3. Cf. *Slaton*, supra (—— U.S. at ——, 93 S.Ct. at 2628).

sion raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppressable within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

"I do not think that reviewing courts can escape this responsibility by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as 'obscene', for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind." (emphasis in text)[4]

In Moore v. State, supra (fn. 1), the court followed a similar procedure although it did not specifically point out the differing standards of review. Justice Klingeman, considering an appeal from an order granting a temporary injunction, first referred to the usual rules governing the review of such proceedings. (470 S. W.2d at 392–393) He then stated that "[w]e have carefully examined and reviewed the entire record, including the exhibits," and said: "We agree with the trial court's findings" that the matter was obscene under the statutory provisions. (470 S.W.2d at 395) This was, in essence, an independent review of the "constitutional facts" forming the basis of the order of suppression.

Since our own Supreme Court has not yet spoken on the subject, we will assume the responsibility of reviewing the record

as a whole to determine the issue of obscenity, vel non, of the material involved in the case.

### III. Defendants' Knowledge of the Nature of the Films

The jury, in answer to specific questions, found that the individual defendants each knowingly permitted the distribution of certain specific films theretofore found to be obscene. The first twenty-four points brought forward complain of these findings with no evidence, insufficient evidence, and great weight and preponderance points. The nature of the attack upon the verdict makes it possible for us to summarize the evidence on the subject so as to make it applicable to each of the several parties, but requires us to identify the parties to the proceeding more in detail than has been done previously.

The State's trial pleading named as defendants Douglas S. Richards, Jr., Mrs. Evelyn Richards, Mrs. Douglas S. Richards, Jr., and Phillip Lynn Cartwright, whom the State alleged were "doing business as Beaumont Cinema X, Inc. Club and Port Arthur Cinema X, Inc. Club." By an appropriate certificate from the Secretary of State, it was established that neither of the "Clubs" was incorporated, notwithstanding the suffix "Inc." appearing in the title of the business.

The defendants, Joseph F. Fertitta and Rosario C. Maceo, doing business as Fertitta-Maceo Realty Company, were the owners of the premises occupied by the Beaumont "Club". The defendant Rose Mary Begnaud was the owner of the premises in Port Arthur occupied by the Port Arthur "Club" which was under lease to the Richards defendants and to Cartwright.

The signature cards from a Beaumont bank offered in evidence showed that the

---

4. For other authoritative cases in accord with this holding, see: Zeitlin v. Arnebergh, 59 Cal.2d 901, 31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707, 715 (1963); People v. Richmond County News, Inc., 9 N.Y.2d 578, 581, 216 N.Y.S.

2d 369, 370, 175 N.E.2d 681, 682 (1961); West v. State, 489 S.W.2d 597, 605 (Tex. Cr.App., 1972); Hunt v. State, 475 S.W. 2d 935, 936 (Tex.Cr.App., 1972); and Longoria v. State, 479 S.W.2d 689, 690 (Tex.Cr.App., 1972).

three Richards defendants were the only persons authorized to make withdrawals from the account of "Beaumont Cinema X", whose address was shown thereon to be 450 Orleans Street, the address where the films were exhibited.[5]

The records of a Port Arthur bank likewise disclosed that the three Richards defendants were the only individuals authorized to make withdrawals from the account of "The Port Arthur Cinema X".

None of the defendants gave testimony and the State did not utilize any of the discovery processes to develop direct testimony connecting the individual Richards defendants with the exhibition of the particular motion picture films involved.

Some of the particular films found to be obscene were purchased by police officers from defendant Cartwright who told the policemen, according to their testimony, that he was manager of both the Beaumont and Port Arthur "Clubs".

Entrance to the theaters was through the payment of money to join a "Club" and the patron was then issued a membership card, the face of which is copied in the margin.[6] Apparently, payment of sufficient money was the only requisite of membership. The patron was then "eligible" to pay for admission to the theater.

■ The names of the defendants were identical with the names of those charged by the State with the operation of the theaters and there was no controverting evidence to that produced by the State.

The rule governing the presumption flowing from an identity or similarity of names is stated in Howell v. Knox, 211 S.W.2d 324, 327 (Tex.Civ.App., Austin, 1948, error ref. n. r. e.), to be:

> "The following from Kelly v. Consolidated Underwriters, Tex.Civ.App., 300 S.W. 981, 984, affirmed on other grounds, Tex.Com.App., 15 S.W.2d 229, is ascribed therein to Robertson v. Du-Bose, 76 Tex. 1, 13 S.W. 300: 'Similarity of name is held to be sufficient to establish the identity of the person, when there is no evidence to the contrary, and no suspicion cast upon the transaction by the evidence.'"

In Eilar v. Theobold, 201 S.W.2d 237, 238 (Tex.Civ.App., San Antonio, 1947, no writ), the court said simply: "Identity of names is prima facie evidence of identity of persons." *Accord:* Kerby v. Ogletree, 313 S.W.2d 325, 329 (Tex.Civ.App., Beaumont, 1958, error ref. n. r. e.).

In this case, there was no testimony tending to cast suspicion upon the testimony just set out or to rebut the presumption of identity. There being "no controverting evidence, proof of identity or similarity of name will suffice." Kerby v. Ogletree, supra. See also, London Properties, Inc. v. Vaccarello, 493 S.W.2d 255, 257 (Tex.Civ. App., Beaumont, 1973, no writ); 1 McCormick & Ray, Texas Law of Evidence § 96 (2d Ed. 1956).

■ Cartwright, as manager of both operations, was familiar with the type of advertisements appearing in the newspapers

---

5. There appears a notation upon the signature card "Chain of Small Movie Theaters/Located: 707 Main St. Fort Worth, Tx. 76102." It was shown that a corporation named "Cinema X, Inc." had been incorporated in Texas with one of the incorporators being Douglas S. Richards, Jr., who gave Fort Worth as his address. Citations upon the Richards defendants were likewise addressed to the Main Street address in Fort Worth.

6. "This acknowledges that the holder is a bona fide member of Cinema X Adult Movie Club, and that he is entitled upon payment of an admission price to view any adult movie exhibited at any of the Cinema X Adult Theatres; further, the holder knows that such movies show and exhibit all forms of human sexuality, and the holder desires to see and view such movies of his own accord." The card which we find in our record shows that it was issued by "Cinema X, Inc. Beaumont, Texas Port Arthur, Texas."

and upon the exteriors of the theaters. The newspaper ads, explicitly advertising "adult" movies for sale, constituted an open invitation to the general public to make their selections and purchases inside the theaters. Advertising has been said to be a type of admission of a party. Southern Pac. Co. v. Godfrey, 48 Tex.Civ.App. 616, 107 S.W. 1135, 1136 (San Antonio, 1908, error ref.). If these films so purchased by the police officers, as well as those which were on exhibition to the "club members" in attendance, were obscene in law as well as in fact—a matter to which we will return later—Cartwright had actual knowledge of the facts.

The Richards defendants argue that the State did not show knowledge on their part of the nature of the films which were exhibited in the two theaters. We have shown their connection with the operation and that Cartwright was their manager. We now turn to the details of the commercial exploitation of the films.

The investigating police officers described the exterior of the two theaters involved, photographs showing the advertising thereon were placed in evidence, and general descriptions of the physical layout of the two theaters were proved. Newspaper advertisements were offered showing that some of the very films involved in this suit were being exhibited at the respective theaters. The signs upon the outside of the theater in Beaumont advised passersby that "adult" films could be purchased inside the theater and, in several instances, a police officer made a purchase of such a motion picture.

The State offered in evidence affidavits made by policemen to procure the issuance of search warrants authorizing the seizure of allegedly obscene motion picture films in each of the theaters. The affidavits are lengthy, describe the scenes shown upon the screen in each of the theaters in detail, and each affidavit contains still photographs taken by the police officers showing scenes from the motion picture films there exhibited. Although not too clear in detail, these photographs disclose scenes of actual heterosexual intercourse along with acts of fellatio. Verbal description of the scenes shown in the respective motion pictures is graphic.

One of the affidavits, addressed to a motion picture shown at the Port Arthur theater, gives the title as "Keep It In The Family", State's Exhibit 16, found by the jury to be obscene in fact—a matter to which we will return later in this opinion.

The Beaumont police officers filed a similar affidavit, also containing still photographs of actual scenes depicted in the motion picture "Back Street Girls", exhibited at the Beaumont theater. This was the title to the film mentioned in Special Issue No. 2, State's Exhibit 6, and found by the jury to be obscene as a matter of fact.

The films so described in the affidavits were seized under search warrants issued by the Justice of the Peace pursuant thereto. Act, § 9. The importance of these episodes to the case lies in the fact that the affidavits were both dated February 29, 1972, and the films were seized on March 2, 1972. According to the State's pleading, one of the obscene films exhibited was titled, "How Do I Love Thee, Let Me Count the Lays," found by the jury to be obscene in fact, Special Issue No. 1. According to the allegations of the State's petition and the evidence on the trial, this film was not shown in Beaumont until July 9, 1972, more than four months subsequent to the searches and seizures of the other films mentioned.

The burden under which the State labored is clearly set out in § 1(F) of the Act wherein it is provided:

" 'Knowingly' means having actual or constructive knowledge of the subject matter. A person shall be deemed to have constructive knowledge of the con-

tents if he has knowledge of facts which would put a reasonable and prudent man on notice as to the suspect nature of the material." [7]

Yet, under the record, only some of which has been spelled out in its tawdry detail, we are asked to say that the defendants had no knowledge, actual or constructive under the statute, of the nature of the films being exhibited. This contention is urged in the face of seizure by the police officers of the allegedly obscene material —and without any testimony from the Richards defendants or anyone in their behalf. We are of the opinion that the State discharged its burden of producing facts which would put a reasonable and prudent man on notice "as to the suspect nature of the material" being exhibited in the theaters.

■ The State also suggests that the Richards defendants are charged with the knowledge possessed by their agent, Cartwright, under the doctrine of respondeat superior. We have held that Cartwright's admissions to the police officers that he was "manager" of the two theaters established his own knowledge of the nature of the materials being exhibited therein. However, when the State seeks to bind the Richards defendants with such knowledge, it encounters the rule that agency cannot be proved by the declarations of the assumed agent, although such declarations may be admitted in corroboration of other evidence of agency. Cf. Cook v. Hamer, 158 Tex. 164, 309 S.W.2d 54, 57–58 (1958) and cases cited therein.

Nevertheless, having reviewed the record under the appropriate standards, Points 1 through 24 are overruled.

## IV. Stanley v. Georgia is Inapplicable

■ Defendants' reliance upon the "Club" theory (see fn. 6, supra), an apparent reliance upon and an attempt to adapt this holding of Stanley v. Georgia, 394 U. S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), to this commercial enterprise, was misplaced even before Slaton was announced.[8] Stanley, holding that the First and Fourteenth Amendments "prohibit making mere private possession of obscene material a crime" (394 U.S. at 568, 89 S.Ct. at 1249), was specifically held to be inapplicable to commercial theaters. Slaton, supra (—— U.S. at ——, 93 S.Ct. 2628).

The trial court, acting under a valid state law, within the limits of the reported decisions, has proscribed the public exhibition of obscene material for profit. Stanley in no way sanctions the conduct which the trial court has prohibited. That portion of the multifarious Point 27 relating to the Stanley case is overruled. Slaton, supra.

## V. Expert Testimony

■ In its effort to meet some of the tests laid down for its guidance which were controlling at the time of the trial, the State offered several witnesses who testified that each of the films inquired about in the first nine issues was obscene. All of defendants' points directed to this line of testimony are overruled since there is no longer any need for the State to offer expert witnesses on the issue of obscenity, vel non.

The Fifth Circuit, in United States v. Groner, 479 F.2d 577 (1973), held that ex-

---

7. Justice McGee, concurring in State v. Scott, supra (fn. 1), has cited many cases supporting the constitutionality of § 1(F) of the Act. (460 S.W.2d at 112)

The other statutory definitions contained in § 1 of the Act are substantially the same as those upheld in Miller and Slaton, supra [fn. 2 (—— U.S. ——, 93 S.Ct. 2607, 37 L.Ed.2d 419 and —— U.S. ——, 93 S.Ct. 2628, 37 L.Ed.2d 446, respectively)].

8. See, Campbell v. State, 169 Tex.Cr. 515, 338 S.W.2d 255, 257 (1960), and Sharp v. State, 495 S.W.2d 906 (Tex.Cr.App., 1973) ; the court in Sharp saying: "The exhibition of a motion picture in a theater at which admission is charged is more than mere private possession."

pert testimony was not required in an obscenity trial.[9] *Groner* was the first case cited by Chief Justice Burger in *Slaton*, supra, in support of this statement:

"Nor was it error to fail to require 'expert' affirmative evidence that the materials were obscene when the materials themselves were actually placed in evidence." (—— U.S. at ——, 93 S.Ct. at 2634)

■ Similarly, defendants' complaint about the geographical area of the "community" standards falls under the impact of the decision in *Miller*, supra [fn. 2, (—— U.S. at ——, 93 S.Ct. 2607)]. Again, *Groner* was one of the leading authorities cited by the Chief Justice.[10] Instead of the so-called "national" standard, the applicable standard is the area of the state (under *Miller*) and of the geographic area from which the jury is drawn (as in *Groner*). The witnesses tendered by the State upon this trial met both of such requirements.

All of defendants' points challenging the testimony of the experts, or the geographical area, are overruled.

## VI. The Specific Films, Section (a) of the Decree

■ As has been indicated earlier, the jury found that each of these specific motion picture films was obscene in fact. The careful trial court submitted the statutory definitions of "obscene", "prurient interest", "matter", "person", "distribute", and "knowingly" in the exact language found in § 1 of the Act and the defendants do not complain thereof.[11]

While we are required to view the films in evidence and to state our independent findings thereon, we are not required by any rule known to us to set out in lurid detail in the printed pages of the lawbooks our summaries thereof. The factual basis for our determination of the nature of these films as being of the hard core genre will be found in the appendix to this opinion where it will be available to counsel and such higher courts as may be called upon to review our action. Thus, we hope to avoid one of the pitfalls in Sunshine Book Company v. Summerfield, 128 F. Supp. 564 (D.D.C.1955), affirmed 101 U. S.App.D.C. 358, 249 F.2d 114 (D.C.Cir. 1957), reversed 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352 (1958), where the trial court's summary of the photographs, it has been said, may have been more obscene than the pictures themselves. Karre, "Stanley v. Georgia: New Directions in Obscenity Regulation?" 48 Tex.L.Rev. 646, 659, fn. 84 (1970).

■ Having reviewed the films in question, we are of the opinion that each film is hard core pornography under any definition of the term, including those so recently laid down in *Miller*, supra (—— U.

9. Judge Gewin, Part II, p. 584; Judge Ainsworth, concurring, p. 586. Judge Clark said, "I find the logic of Part II of Judge Gewin's en banc opinion and Judge Ainsworth's concurrence therein to be compelling." At p. 588. The first footnote of the majority opinion by Judge Gewin says: "To the extent that Judge Clark concurs specially, it is the majority opinion of the court." At p. 578.

10. *Miller*, supra (—— U.S. at ——, 93 S.Ct. 2607).

11. After quoting from A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), and § 1 of the Act,

Judge Odom in *West*, supra (489 S.W.2d at 604, fn. 16), continued: "Since the statutory definition almost follows word-for-word the definition promulgated by the Supreme Court in Memoirs, we perceive no significant differences in these definitions. See Bryers v. State, supra [Tex.Cr.App., 480 S.W.2d 712]. See also, Newman v. Conover, 313 F.Supp. 623 (N. D.Tex.1970)."

Although the *Memoirs* requirement that the material be proved to be "utterly without redeeming social value" was removed in *Miller* (—— U.S. at ——, 93 S. Ct. 2607), we do not believe that the additional burden of establishing this negative fact, assumed by the State in this case, could possibly have injured defendants.

S. at ——, 93 S.Ct. 2607, 37 L.Ed.2d 419), quoted earlier.

Thus, we are in accord with the views expressed by the court in the "Deep Throat" case, People v. Mature Enterprises, Inc., 73 Misc.2d 749, 343 N.Y.S.2d 911 (N.Y.Crim.Ct., New York City, 1973). These films reach "a nadir of decadence" and are "indisputably obscene by any legal measurement."

The nine specific films which we have reviewed are obscene. From the first to the last scene, each film is a filthy, cynical, disgusting portrayal of explicit sexual activity. Not only is there in it no word, scene, or suggestion of the romantic, sentimental, poetic or spiritual aspects of the sex relation, but the scenes so exhibited on the screen are not even bawdy sex or comic sex or sex described with vulgar good humor. No glory, no beauty, no stars—just mud. The whole of each of the films is "sick sexuality", deliberate, studied exercise in the depiction of sex relations (and sexual deviations) as debasing filthy and revolting. On page 483 of 370 U.S., on page 1434 of 82 S.Ct., Justice Harlan's opinion in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962), quotes the long series of definitions of "obscene" from Webster's New International Dictionary (unabridged, 2d Ed., 1956). It is a remarkable fact that each of the films which we have reviewed fits every single one of these numerous meanings.

It is more than coincidental, too, that each of the films which we find in our record fits precisely the definitions of "obscene" and "pornographic material" quoted by the Chief Justice in *Miller*, supra (—— U.S. at ——, 93 S.Ct. 2607, fn. 2). Cf. People v. Fritch, 13 N.Y.2d 119, 243 N.Y.S.2d 1, 192 N.E.2d 713, 718 (1963).

So holding, we overrule all points brought forward by the defendants challenging the court's injunction restraining the further exhibition of these particular films. Section (a) of the decree is in all things approved and affirmed.

## VII. Section (b) of the Decree—The Violation of Art. 527, Penal Code, Enjoined

As noted earlier [Part I, (b), supra], the defendants were enjoined from the exhibition of any other obscene material "as those terms are defined in Article 527 of the Texas Penal Code" in violation of the Act. This is "prior restraint" with a vengeance and without any precise guidelines to govern the defendants' future conduct. Ordinarily, injunctions may not be used to prevent violation of penal statutes. Ex parte Hughes, 133 Tex. 505, 129 S.W.2d 270, 274 (1939).

But, there is a more compelling reason for the denial of the right of the trial court to enter any such broad order as we now review. In the field of First Amendment rights, any prior restraint is presumed to be invalid unless compelling reasons are shown. This facet of the decree does not even comport with our basic rules of civil procedure, much less the almost insurmountable obstacle of the First Amendment. Justice Klingeman in Moore v. State, supra (470 S.W.2d at 396), collated the authorities which require us to set aside such a vague decree.

Thus, we are of the opinion that section (b) [Part I, supra] is violative of the provisions of Rule 683, T.R.C.P. We adopt this language from *Moore*, supra: "[I]t prohibits generally the defendants from violating a penal statute, without clear, precise or definite guide lines." Insofar as defendants' multifarious Point 25 attacks the generality of section (b), of the injunctive decree, such point is sustained, and the decree of the trial court is modified by striking therefrom such general restraint of the violation of the penal statute.

*VIII. Section (c) of the Decree—Exhibition of Films Showing Sexual Acts Prohibited*

When we come to examine section (c) of the injunctive order [Part I, (c), supra], we enter a field which has plagued the courts for years. This court is bound, of course, by the decisions of the United States Supreme Court interpreting the federal constitution, including the First Amendment thereto. Because the federal constitution is controlling in the event of conflict with any state statute or constitutional provision, we must consider the federal constitutional implications raised by the defendants.

Unfortunately, the most recent series of decisions by the Supreme Court (fn. 2 supra) do not address themselves to this specific question; and counsel has not cited to us a case directly in point.

We approach this problem gingerly because we must start with the premise that "[a]ny system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). And it is, of course, incumbent upon the censor to prove that the film is obscene. Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

Having noted only the tip of the iceberg, we observe that if anything is clear in this area of the law, it is that "obscenity is not within the area of constitutionally protected speech or press." Roth, supra (354 U.S. at 485, 77 S.Ct. at 1309, 1 L.Ed.2d 1498).

Indeed, in *Slaton,* supra, the Court said: "This Court has consistently held that obscene material is not protected by the First Amendment as a limitation on the state police power by virtue of the Fourteenth Amendment." (—— U.S. at ——, 93 S.Ct. at 2633, 37 L.Ed.2d 446) But, it is equally clear that "sex and obscenity are not synonymous." Roth, supra (354 U.S. at 487, 77 S.Ct. at 1310). The determination of what is obscene and impermissible and that which is protected under the First Amendment requires fine discernment in some instances. However, it is obvious that films explicitly portraying sexual acts as described in section (c) of the decree are obscene. Such films constitute "hard core pornography". Miller, supra (—— U. S. at ——, 93 S.Ct. 2607, 37 L.Ed.2d 419).

The films described in this section of the order are picture films depicting males and females engaging in actual sexual intercourse, oral sodomy, anal sodomy, and cunnilingus. The technological features of motion picture films makes the ideas presented more comprehensible than is the case in any medium other than television. Landau v. Fording, 245 Cal.App.2d 820, 54 Cal.Rptr. 177, 181, affirmed 388 U.S. 456, 87 S.Ct. 2109, 18 L.Ed.2d 1317 (1967). Thus, sexual scenes, because of the nature of the medium, may transcend the bounds of the constitutional guarantee long before a frank description of the same scenes in the written word. *Landau,* supra.

Section (c) of the prohibitory order is in accord with the new Penal Code of Texas adopted by the recent session of the Legislature. Acts 63rd Leg., ch. 399, p. —— (1973). In essence, it prohibits exhibition of films showing: (a) "deviate sexual intercourse", as defined in § 21.01(1) and § 43.01(1); (b) "sexual intercourse", as that term is defined in § 21.01(3) and § 43.-01(5); and (c) the old offense of bestiality as now defined in § 21.07(a)(4).

Unquestionably, as challenged by defendants in their Point 25, section (c) of the decree summarized in Part I of this opinion "attempts to put a prior restraint on the showing or exhibiting of films . . . when there has been no [prior] adjudication that they are obscene." The cases cited by the defendants in support of such

contention and the order in which they are cited are set forth in the footnote.[12]

We recognize the treacherous ground upon which we tread in upholding the prohibitory injunction against the exhibition of motion pictures portraying the sexual scenes proscribed therein. A long line of cases, only a few of which are cited by defendants as set out in the adjacent footnote, admonish the courts to refrain from placing a prior restraint upon *any* expression protected by the First Amendment. Indeed, as was said in Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971), any prior restraint on expression comes to the court with "a 'heavy presumption' against its constitutional validity."

In the annotation found in "Obscenity—Procedures", 5 A.L.R.3d 1214, 1229 (1966), it is said, "Restraint by injunction has traditionally been thought to inhibit freedom of speech more seriously than restraint by penalties imposed after publication." We appreciate the seriousness of the challenge against the restraint imposed by the trial court; and we recognize that there is respectable authority for challenging the validity thereof. Nevertheless, considering the specificity of the prohibitory order, the course of conduct of the defendants, and the fact that such future exhibitions would be of hard core pornography, we are of the opinion that the injunction was properly issued.

The trial court was confronted with an unchallenged record showing that the defendants, over a long period of time, had sold and exhibited obscene and pornographic films in violation of a valid criminal statute. Obviously the cumbersome process of seizing and condemning each particular film when exhibited would take all of the time of one district judge, a justice of the peace standing by to issue search warrants and hold preliminary hearings, as well as a corps of police officers and assistant district attorneys.[13]

Chief Justice Burger said in *Slaton,* supra (—— U.S. at ——, 93 S.Ct. at 2633): "It should be clear from the outset that we do not undertake to tell the States what they must do, but rather to define the area in which they may chart their own course in dealing with obscene material." Historically, in other areas of the law than pornography, equity has been able to fashion the remedies necessary to the public welfare. Thus, if we liken defendants' conduct to that of a public nuisance, there would be no obstacle to equity enjoining its continuance. See the long line of cases cited in Lowe, 6 Texas Practice, Remedies § 33, p. 61 (2d Ed. 1973). We are unwilling to hold that there is no method which can be found to stop conduct of parties such as shown by our record.

The decree is specific, definite, and clear. The defendants do not even need a dictionary to learn what is prohibited since the parenthetical material following the Latin-derived words makes the order clear. The decree, being based upon a valid statute, should be upheld, if possible. We modify, and affirm, this section of the decree, doing so under what we consider to be the explicit holding of *Miller,* supra, although some may term the following quotation as dictum.

In *Miller,* supra, the Court gave "a few plain examples of what a state statute could define for regulation":

"(a) Patently offensive representations or descriptions of ultimate sexual

---

12. "Smith v. California, 361 U.S. 147 [80 S.Ct. 215, 4 L.Ed.2d 205]; Marcus v. Search Warrants of Property, 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127]; Quantity of Copies of Books v. Kansas, 378 U.S. 205 [84 S.Ct. 1723, 12 L.Ed.2d 809]; Beauharnais v. Illinois, 343 U.S. 250 [72 S.Ct. 725, 96 L.Ed. 919]; New York Times Co. v. Sullivan, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686]; and Gooding v. Wilson, 405 U.S. 518 [92 S.Ct. 1103, 31 L.Ed.2d 408]."

13. For an account of the long and tedious process, see *Slaton,* supra (—— U.S. at ——, 93 S.Ct. 2628).

acts, normal or perverted, actual or simulated.

"(b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

"Sex and nudity may not be exploited without limit by films or pictures exhibited or sold in places of public accommodation any more than live sex and nudity can be exhibited or sold without limit in such public places. At a minimum, pru-rient, patently offensive depiction or description of sexual conduct must have serious literary, artistic, political or scientific value to merit First Amendment protection." (—— U.S. at ——, 93 S.Ct. at 2615–2616, 37 L.Ed.2d 419, footnote omitted)

And, it should be remembered that in *Slaton,* the Court held that a theater to which an admission charge was required for admission was held to be a place of "public accommodation", (—— U.S. at ——, 93 S.Ct. 2628, 37 L.Ed.2d 446).

There is a limitation beyond which the states may not go. The Chief Justice said in *Miller* (—— U.S. at ——, 93 S.Ct. at 2614) :

"We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited. See Interstate Circuit, Inc. v. Dallas, *supra,* 390 U.S. 676 at 682–685, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968). As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." (footnote citation omitted)

The defendants' First Amendment rights must be respected; but, equally important, their commercial exploitation of hard core pornography must be subservient to the general public welfare as defined by our Legislature. Defendants' rights to profit from the exhibition of such films, unprotected by any claim of First Amendment privilege, is all that is prohibited by the trial court's order as amended.

Defendants do not present to us a supposed case or hypothetical situation wherein a motion picture might have some semblance of social value or even a modicum of artistic, literary, scientific, educational, or other merit is considered for exhibition. Instead, standing firm upon their supposed constitutional right to knowingly show obscene films for profit, such as found in our record, which are utterly without redeeming social importance and constituting hard core pornography, they say that the State of Texas is completely powerless to enjoin future conduct.

The mere statement of the premise shows its invalidity. Grant that we should be cautious in this area, we are unwilling to concede that the State must bring suit each time the defendants change the obscene menu in their passion pits. Nor are we willing to so tie the hands of the chancellor that he may not, upon such a showing as made here, prohibit future conduct of the nature shown to have been done solely in the pursuit of profit.

We are of the opinion that we can reform the provisions of section (c) of the injunctive decree so as to make it conform to the pronouncements in *Miller,* supra, and our revision of the decree is to be found in the "Conclusion" of this opinion. If this be contrary to the precepts of the present constitutional system—and we have not been cited to any case so holding—we, as an intermediate court, will conform our mandate to that of overriding authority when required so to do.

All of defendants' points challenging section (c) of the decree, having been considered, are overruled.

## IX. Other Points of Error

We do not find it necessary to discuss in detail all of the other points of error brought forward by the defendants, e. g., Points 33 and 34, relating to the search warrants. In the first place, the record is clear that several of the items found to be obscene were not procured under a search warrant but through purchase by the police officers from the defendant Cartwright on the premises of the Beaumont theater. Some of the particular films were brought to the office of the District Attorney by defendants' counsel during the course of the hearing which would have led to the issuance of a search warrant so the question of an illegal seizure is not presented. And finally, the points are submitted without citation of a single authority and the record reference is confined to a voir dire examination by defendants' counsel, the statement of his objection, and the court's order overruling the objection.

We do not deem it proper to discuss a question of constitutional magnitude presented upon such flimsy grounds. Points 33 and 34 are overruled.

Having reviewed all of the other points brought forward and, failing to find reversible error, each is overruled without further comment.

## X. Conclusion

The decree of the trial court [Part I, supra] is affirmed as to section (a) thereof. Section (b) thereof, enjoining the future violations of Art. 527, Penal Code, is deleted and stricken from the order.

Section (c) of the order [Part I, supra] is modified by adding thereto a sentence which will follow the language thereof:

"The injunction granted by this paragraph of the order is limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have any serious literary, artistic, political, or scientific value."

As modified, the judgment of the trial court is Affirmed. All costs are adjudged against the defendants.

Modified and affirmed.